GRAHAM–WHITE SALES CORPORA-
TION, Plaintiff,

v.

The PRIME MANUFACTURING COM-
PANY, Defendant.

No. 58–C–181.

United States District Court
E. D. Wisconsin.

June 30, 1964.

Quarles, Herriott & Clemons, Adrian L. Bateman, J., Milwaukee, Wis., for plaintiff.

Michael, Best & Friedrich, Gerrit D. Foster, Paul R. Puerner, Milwaukee, Wis., for defendant.

TEHAN, Chief Judge.

This is a suit for infringement of two patents, Frantz, No. 2,589,794, (hereinafter referred to as '794) a control valve for a diesel locomotive sanding system, which issued to Virgil L. Frantz on March 18, 1952 on an application filed

January 16, 1947 and Frantz No. 2,739,-570, (hereinafter referred to as '570) a bell ringer for diesel locomotives which issued March 27, 1956, on an application filed February 2, 1951. Plaintiff, who is the legal owner of the patents by assignment from Virgil L. Frantz seeks an injunction and an accounting.

This court has jurisdiction of the subject matter and the parties.

Defendant, by its answer and amendments thereto, denied infringement of both, asserted invalidity of the patents and alleged, as a separate defense, that by reason of the relationship between the parties and the conduct of Graham-White Sales Corporation, it is estopped from maintaining this action.

After trial of the action to the court, the following issues remain between the parties:

I. Patent No. 2,589,794—Control Valve Patent

1. Estoppel of plaintiff to maintain this action by virtue of the relationship of the parties.

2. Validity of the patent.

3. Infringement.

II. Patent No. 2,739,570—Bell Ringer

1. Estoppel by virtue of inventive contribution and by the business relationship between Prime and Graham.

2. Validity of the patent.

I. Patent No. 2,589,794—Control Valve Patent.

1. Estoppel.

For some years prior to 1942, the Graham-White Sander Corporation, a Virginia corporation, was engaged in the making and selling of sanders and washout plugs for railway locomotives and during that period had obtained a number of patents covering its products. It ceased to do business after 1942. Virgil L. Frantz is the inventor of both devices covered by the patents in suit and one of the majority stockholders of Graham-White Sander Corporation. He was also a managing partner of Graham-White Manufacturing Company, a partnership, which was organized on or about September, 1942, as a successor to Graham-White Sander Corporation. The partnership made control valves for sanding systems and bell ringers for locomotives.

Prior to 1942, defendant, The Prime Manufacturing Company, was in the railway supply business handling a line of locomotive accessories which were sold by defendant under its trade name "Prime". Defendant had and still has its own engineering and research department, machine shop, assembly shop and small brass foundry. On September 24, 1942, Prime and Graham-White Manufacturing Company entered into a written agreement by which defendant, Prime, bought the sander and washout plug business of Graham-White Sander Corporation, including thirteen patents and the trade name "Graham-White" for sanders. The obligations under the agreement and manufacturing facilities of Graham-White Sander Corporation were taken over by Graham-White Manufacturing Company. Consideration for this sale was the sum of $20,000. The inventory of washout plugs were included in the sale but not the inventory of sanding equipment. All patterns, dies, tools, jigs, samples, sales literature and advertising matter used in the sander and washout plug business were included. The agreement provided that in relation to the sanding equipment only that Prime would buy all its sanding equipment from the Graham-White Manufacturing Company for a period of two years from October 1, 1942 and pay therefor 80% of the net selling price for such sanding equipment. Graham-White Company was given the option of renewing the agreement for a period of two years on and after October 1, 1944, upon the same terms except that the net selling price paid would be 60% rather than 80%.

Also included in the agreement is a provision for the employment of Virgil L. Frantz and James Frantz, his father. That provision of the agreement reads as follows:

"5. PURCHASER hereby engages said James Frantz and Virgil L.

Frantz for a period of six months beginning with October 1, 1942, for the purpose of assisting PURCHASER in the development and selling of the sanders, instructing PURCHASER'S salesmen and other employees and to introduce the officers, agents and representatives of the PURCHASER to the customers of the corporation and to aid the PURCHASER in the promotion of sales, and to instruct its salesmen.

"6. PURCHASER agrees to pay James Frantz and Virgil L. Frantz each a salary of One Thousand Dollars ($1000.00) a month during such period of employment, such salary to be paid semi-monthly. PURCHASER shall have the option of continuing such employment of either or both of said parties at the same rate of compensation from month to month after March 31, 1943 by giving them, or either of them, one month's notice in writing of its intention to so continue such employment.

"7. James Frantz and Virgil L. Frantz jointly and severally agree during the period of six months following October 1, 1942 that they will discharge and perform the duties and services above referred to and aid and assist the PURCHASER faithfully in maintaining, promoting and building up the business of the PURCHASER in relation to such sanders and washout plugs. The reasonable traveling, hotel and incidental expenses of said parties in going from, while away, and in returning to their places of abode shall be paid by PURCHASER when incurred at the request or with the consent of the PURCHASER. It is understood and agreed that there is nothing in this agreement to bind said James Frantz and Virgil L. Frantz to devote their full time or to go on the road in a traveling capacity for the PURCHASER and only such time is to be given and such trips are to be made as the PURCHASER may consider it to be for the best interest of the sander and washout plug business."

Neither the option given Graham-White of renewing the exclusive buy and sell agreement at the expiration of the two year period on October 1, 1944, or Prime's option to continue the employment of Virgil L. Frantz and James Frantz or either of them after the expiration of the six month period on March 31, 1943, were exercised by the parties as provided by the written contract.

However, after October 1, 1944, the parties continued doing business together in the same way, Graham-White manufacturing exclusively for Prime and Prime buying exclusively from Graham-White. The only difference was that Graham-White sold the equipment to Prime at a negotiated fixed price and Prime then sold the products at sales prices fixed by it.

From 1942 to March of 1957, Prime purchased GWS–250 control valves in the amount of $629,957 out of a total of $3,721,000 of products purchased from Frantz and Prime spent an estimated $531,708 for both engineering development and sales promotion for products which Frantz manufactured exclusively for Prime (including the '570 bell ringer hereinafter discussed).

One of the patents sold to Prime under the agreement was Patent No. 1,581,546, hereinafter referred to as Ranson. At the time of the sale, the Ranson valve was being manufactured by Graham-White and was a standard control valve for use in steam locomotives. After the sale Graham-White continued manufacturing the Ranson valves which were then sold by Prime pursuant to the 1942 contract. Virgil L. Frantz, the inventor of the patent in suit and who had, for many years been active in the design and development of improvements of sanding mechanisms for the railroad industry, continued his efforts and sometime during the six month period of his employment with Prime, he conceived and reduced to practice, on March 22, 1943, a

combination control valve and sand trap covered by Patent No. 2,426,499 (hereinafter referred to as '499). Sometime during the year following March 22, 1943, Mr. Frantz told Prime about this invention and left a model of the device with Prime in Milwaukee. However, for reasons which do not specifically appear the parties never placed on the market any devices embodying the '499 patent. On March 4, 1944, Frantz filed an application for a patent covering this valve and sand trap, and on August 26, 1947, the patent issued. All the work on this project was done by Mr. Frantz at his plant in Roanoke, Virginia, and the patent was obtained at his expense.

Not satisfied that the '499 conception solved all the problems, Mr. Frantz continued his search for an improved valve which resulted in the conception of the '794 valve. Sometime in 1946, this valve was placed on the market by Prime. Plaintiff manufactured the new valve and it was marketed by Prime as the GWS–250 valve.

On March 18, 1949, Prime registered on the U. S. Supplemental Register the trademark PRIME "ONE–LINE" SANDING. All of the valves sold by Prime and its advertising literature bore the marking "Graham-White-Prime Milwaukee."

A substantial amount of the correspondence between the two parties was introduced at the trial and these exhibits as well as the testimony in the record disclose a free interchange of ideas and suggestions relating to the improvement of the sanding equipment which Graham-White manufactured exclusively for Prime and which Prime marketed. For instance, on May 28, 1943, D. Allcott Kelly, Assistant to the then President of Prime, wrote a letter to Frantz enclosing a drawing of a proposed type of adjustable nozzle. On June 1, 1943, Virgil Frantz answered the letter evaluating the proposal and adding suggestions in relation thereto. The letter concluded with this paragraph:

"I think it would be wise for you to come to Roanoke sometime in the near future so that we could sit down *and talk over this whole nozzle situation with the thought of getting something definite worked out that will do a good job.*" (Emphasis added)

The exchange of correspondence in relation to a possible change of design of sander equipment evidently presented the parties with the necessity of resolving the question of whether Graham-White as the manufacturer or Prime as the seller had the final decision as to change in sander design. This is illustrated by the following paragraph in a letter of June 5, 1943 from Virgil L. Frantz to D. Allcott Kelly:

"At the time of making the contract here last Fall, it was understood between Mr. Wild and myself that when it came to changes of design in sander equipment that we would work these out together. After all, according to the contract all the sanders you sell are to be manufactured by us and we find in developing new equipment or making changes that we have to take the manufacturing problems into consideration just as we do the question of sales and service. Would therefore strongly suggest that after you complete your discussions with your men in Milwaukee that you try to arrange to get to Roanoke so that we can sit down and talk over this whole matter of sander and nozzle design. After all, we have a good bit of past history along that line here and I believe that the two of us can decide what is practical and wise for us to do."

We find again that a letter of June 8, 1943, from Frantz to Kelly reiterates the need to iron out the problem of nozzle design by mutual agreement. Frantz says in that letter:

"I still think the only way to work this matter out sensibly is for you to come to Roanoke and sit down and see what we can arrive at. * * *"

The gist of Mr. Kelly's reply to Frantz on June 8, 1943 confirmed that any design changes would be approved by both parties. The letter stated:

"Naturally anything we design or develop will be submitted to you and in final announcement to the field will, of course, have your approval."

After Frantz had reduced '499 to practice, he continued working to improve its design and in July of 1944, he modified the valve for the sand trap by placing the restricting orifice for the normal sanding air in the casing of the valve instead of the piston within the valve. This new version was referred to by the parties as the "New Diesel Sandtrap." After this change was made there followed extensive correspondence between Kelly and Frantz concerning the design and adjustment of the valve and trap including (1) the pros and cons on the adjustment of the type of nozzle, (2) the amount of piping required, (3) costs, (4) the making of wood patterns, and, (5) suggestions for presenting the New Diesel Sand trap to the locomotive builders and gaining their acceptance of it.

Before any concrete steps were taken to place the new trap ('499) on the market, Frantz was already working on an improvement which resulted in the 250 valve—the commercial embodiment of the '794, the patent in suit. On April 27, 1945, in a letter to Kelly of Prime, he states:

"I also have in mind a modification of this installation using a valve similar to the E valve but slightly cheaper to manufacture. With the use of this valve there would be one valve to each two traps instead of one on each trap. This would give us an installation similar to the use of the E except that we would eliminate a good bit of piping."

By December of 1945, the New Diesel Sand trap and the DSX valve (the valve embodying the patent in suit) had been presented to Alco (a large locomotive builder) who had indicated its approval.

In a letter of December 21, 1945, Kelly of Prime wrote Frantz:

"The Alco people really like the new Diesel sand trap. They are all set to start installing them the first of the year. Of course, this is not possible."

Then after mentioning some suggested changes and asking for a cost figure on the new trap and valve the letter concludes:

"Again, Virg, I would appreciate your getting me these prices as soon as possible so that we may begin to lay out our literature for formal presentation to the various builders."

Thereafter the correspondence indicates that the parties cooperated in getting the 250 valve on the market as fast as possible. In the beginning of the enterprise, Prime cast in its foundry the bodies and caps for the DSX (valve in suit), and the castings were machined by Frantz in Roanoke, Virginia. A reading of the correspondence between Prime and Frantz from June of 1946 to February of 1947, reveals a sense of urgency on the part of both to get all the "bugs" ironed out in the new sand trap as quickly as possible in order to "sell" the industry on the 250-valve. Various pattern changes were from time to time suggested by either Prime or Frantz and agreed upon tests of the valves were made by Prime and the results relayed to Frantz. Also, the exchange of letters discloses that terms to be used were standardized. Thus Bredlow of Prime, after receiving pattern equipment for the valve wrote to Frantz on June 25, 1946:

"I note on your print you call it an 'actuating' valve. I believe, Virg, we should try and standardize as far as our terms are concerned so that nobody is confused and as we have tagged it 'control' valve, I think all prints should be marked accordingly —don't you agree?"

In the same letter, Bredlow stated:

"Also, regarding the marking on this valve, we note you have on it 'Graham-White Patent Pending'. Don't you think it would be wise to place somewhere on the valve our usual markings 'Graham-White Prime Milwaukee' and the number of the valve—GWS–250."

Both suggestions were acceded to by Frantz to Bredlow in a letter of June 28, 1946, in the following language:

"We will try to use the term 'control' in referring to this valve in the future and will have our prints changed accordingly. I think you are right in this."

and,

"The marking on these valves should be, as you suggest, 'Graham-White Prime Milwaukee', and the words 'Patents Pending' should appear on the valve. This was merely an oversight in the rush of getting these patterns made and out to you."

As was stated before, Frantz filed his application for the patent in suit covering the Graham-White valve in January of 1947. There was considerable correspondence between Prime and Frantz in regard to prosecution of the application for both the '794 and '499 patents. On May 22, 1947, Frantz wrote to Bredlow of Prime as follows:

"We have patents filed on the one pipe line sanding trap and on the GWS–250 valve. Our attorney does not think that we can patent the idea of using one pipe line for sanding and cleaning. However, I am going to follow that up again with him and see if he thinks there is any chance of getting even a scarecrow on this line."

Kelly answered on May 26, 1947:

"I'm disappointed in your letter of May 22nd, in connection with the patents on the one-line sanding.

"Inasmuch as two heads are always better than one, I wish you would send me copies of your application, and I will go over them with our attorney and see if we can get something that might be stronger than what you indicate your attorney is securing."

In reply, Frantz wrote to Kelly on May 29, 1947:

"I am in receipt of your letter of May 26 concerning the patent situation on the one pipe line sanding. I don't see why you were disappointed in what I had to say in my letter of May 22nd. After all, we have patented the trap and we have patented the valve. I don't believe that any one can patent the use of one pipe line for sanding and cleaning.

"You must bear in mind that not only the writer but our patent attorneys in Washington have worked on sander patents for the last twenty-five years and we are pretty familiar with the art. We worked over a year studying this new method of sanding and the patent possibilities in connection with it. I was in Washington no less than a half dozen times in connection with these patent applications and each application was re-written four or five times before we got it in the form we thought covered the territory.

"I agree with you that two heads are better than one in a great many cases but since we have had more than two heads already at work on this job I am afraid that we would fall into the other old adage, 'Too many cooks spoil the broth.'

"To intelligently go into these patent applications I would have to meet with you and your lawyer and explain the whys and wherefores of the different things that have been done. I don't believe that you or your patent attorney would get much out of these applications unless you went over them either with me or our attorney. * * *"

And in answer thereto Kelly wrote on June 4, 1947, as follows:

"I have your letter of May 29th in response to mine of May 26th, and it

would seem by the tone of it that I have evidently given you the wrong impression—I did not in any way mean to imply with my letter of May 26th that I was disappointed in your efforts to secure patents but I am disappointed—as I feel you are—that it looks at this point that we will be unable to get any protection on the matter of one-line sanding.

*"The combined efforts of all of us in the development of this new line of sanding seems to justify some protection.*

"In suggesting that you send me copies of the applications as they are now made, for review by ourselves and our patent attorneys, we again did not mean to imply that you have not covered the ground completely nor did we mean to imply that your insight and perception was in any way lacking to insure all possible coverage.

*"I know you will agree, however, that there is a possibility that we may be able to add something to these patents for our mutual benefit and protection.* I agree personally with you that a meeting with us and our attorneys is desirable and advisable and I feel we should meet personally soon, in any event, for a discussion of many things that have accumulated since our last meeting—inasmuch as the convention is coming up now and we will be away from the office until after the 4th of July, and I imagine you will be unavailable until about that time, also, it seems the best plan for you to send me as quickly as possible copies of these applications so I can go over them with our patent attorney before I leave town, allowing him the interim between now and our proposed meeting to digest the applications, and then directly after July 4th we will arrange for a meeting and we will all sit down together and see what evolves.

"I hope you can lay your hands on these applications and get them to me before you leave town, for if you do not, of course, the time between now and the time of our meeting cannot be used profitably.

"There are some other phases of *our present line of sanding* which I believe may have some patent possibilities, about which I am extremely anxious to talk with you, but that necessarily must be done personally and not in correspondence—therefore I am extremely anxious to have this discussion with you so I will lay my plans and I trust you can lay yours so that some time during the early part of July we can get together up here for a few days of real hard work.

"As you know, our imitators are out and I am sure some of them are encroaching on us.

"I see in the patent structure of *our new line of sanding* a possibility, if we use it correctly, the likes of which I have never seen before in the railroad supply business. Because of this you can understand my extreme interest in the patents at this time—I feel sure when I have had a chance to explain to you personally and in detail what I see that you will agree with me." (Emphasis added)

It will be noted that although the patent application was never shown to Prime, it was freely discussed and there was no attempt by Frantz to maintain secrecy in relation thereto. The reason advanced by Frantz for failing to forward the application to Prime's attorneys was the practical one that "Too many cooks spoil the broth."

After the filing of the application and the issuance of the patent there was no request of any kind made by Frantz for an increase in the selling price by virtue of his patent protection. There was absolutely no indication that either party believed that a new factor had been introduced in their relationship which required a revision of the terms of their

agreement. The only conclusion that can be drawn from this correspondence is that Prime assumed that Graham-White recognized that Prime had an interest in any patent protection obtained. It is equally obvious from the correspondence that Frantz was aware of Prime's assumption that it had an interest in the patent.

As the correspondence which has been set forth in considerable detail shows there were many instances when Prime's letters to Frantz reveal that Prime assumed it had rights in the '794 patent, and that Frantz in his replies either actually encouraged Prime in this belief, or chose not to "lay his cards on the table" by asserting his exclusive right. He did not contest Prime's request for marking the valves "Patent Pending-GWS Prime Milwaukee". Frantz's reason for not forwarding the patent application related only to expediency not because he considered it highly confidential. Frantz's frank discussion of the difficulty of obtaining patent protection for the one-line sanding system is completely inconsistent with a position of one seeking a patent for purpose of excluding Prime as well as others, from manufacturing and practicing under the patent.

In March of 1957 the relationship between the parties came to rather an abrupt end. In January, 1954, Harvey F. Bredlow, who had been in charge of Prime's sanding department left his position with Prime and accepted employment as a salesman with Graham-White. He subsequently became a director and stockholder of plaintiff and is now its President. D. Allcott Kelly, who had been assistant to the President of Prime, also left Prime on March 15, 1957 to join Graham-White. He became the first President of Graham-White and is still a director and stockholder but not an officer. It is significant that the relationship of the parties which had contin-ued amicably through the years resulting in financial benefits to both came to an end after both Kelly and Bredlow, who had acted for Prime in its dealings with Graham-White down through the years, severed connections with Prime and took positions of importance with Graham-White. The conclusion is inescapable that the decision to assert rights under the patent was related to this defection of Bredlow and Kelly.

Prime contends that it has acquired an implied license to practice the invention disclosed in '794, the patent in suit, by virtue of (1) a "shop right" in Patent '499 which was conceived by Virgil Frantz during the six months of his employment by Prime under the 1942 contract[1] (See § 376, 1A Walker on Patents) and/or (2) an implied license arising from the conduct of Frantz—the owner of the patent—in the light of the business relationship between Frantz and Prime. (See § 374 and § 375, 1A Walker on Patents)

█ It is our opinion that both of these grounds allegedly giving rise to an implied license to Prime are in reality a specific application of the general doctrine of equitable estoppel.

"The vital principle [equitable estoppel] is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a position is sternly forbidden. It involves fraud and falsehood and the law abhors both. This remedy is always so applied as to promote the ends of justice." Dickerson v. Colgrove, 100 U.S. 578, at p. 580, 25 L.Ed. 618.

█ The doctrine of the "shop right" in patent cases has evolved from this general principle. It usually arises

"where the inventor induces his employer to proceed and not only fails

1. Prime further contends that since, to make, use and sell the control valve and sand trap as defined in Claim '499 under its license, would infringe on the after-acquired patent in suit '794, Graham-White cannot assert Patent '794 against Prime.

to object to the use, but stands by or assists, while permitting his employer to assume expense and put himself in a position where it would be to his detriment to be compelled to relinquish further use of the invention." [citing cases]

Gateway Inc. v. Hillgren (1949) (D.C.) 82 F.Supp. 546, at 555, 181 F.2d 1010. See also Gill v. United States, 160 U.S. 426, at 430, 16 S.Ct. 322, 40 L.Ed. 480, and United States v. Dubilier Condensation Corp., 289 U.S. 178 at 188, 53 S.Ct. 554, 77 L.Ed. 1114.

The relationship of the parties to each other in the case at bar is unique, and not easily categorized. The parties have cited no cases nor have we found any involving exactly the same set of facts. The case in which the relationship of the parties most closely resembles that of the case at bar is Lukens Steel Co. v. American Locomotive Co., D.C., 99 F.Supp. 442, 2 Cir., 197 F.2d 939. Graham-White seeks to distinguish Lukens for the reason that in that case the defendant was making, rather than selling the device embodying the patent in suit. However, under the facts here as we find them the selling by Prime of the valves supplied by Graham-White was an exercise of rights and not a mere arms-length sale.

It is true that except for the six months of employment of Frantz by Prime, no formal employer-employe relationship existed. The facts as heretofore set out, however, disclose a business relationship, which, in terms of the reciprocal duties and responsibilities of the parties, requires the application of the same equitable principles as are involved in employer-employe relationship. Prime and the Frantzes (Graham-White) embarked together on a common enterprise to build a successful and profitable business of supplying sander equipment to the railroads of this country. Each party reposed confidence in the integrity and ability of the other. Graham-White undertook to manufacture the equipment and Prime to market it. Each party,

however, at various times made its contribution in the area substantially reserved to the other. Thus, Prime did some testing of the equipment and for a period of time cast some of the valve bodies in Milwaukee. Representatives from both parties made presentation to the railroad industry in a joint effort to gain their acceptance of the new valves. Both parties participated in the search for improvements. The record clearly establishes that both Graham-White and Prime viewed the arrangement as a common enterprise and Graham-White as well as Prime assumed that any patents obtained upon the improvements of the sanding equipment originally manufactured by Graham-White and covered by the patents sold to Prime under the 1942 contract were obtained for their mutual benefit and would not be asserted by Graham-White against Prime.

We hold that Prime has acquired an implied license in Patent '794 in the nature of a "shop right" and Graham-White is estopped thereby from suing for infringement.

2. Validity of '794.

Prime has asserted invalidity of the patent on three grounds (1) lack of inventiveness, (2) double patenting, and, (3) indefiniteness.

1. Lack of inventiveness.

The device of Patent '794 is an operating valve for controlling the action of one or more sand traps in a sanding system for locomotives. A locomotive has a sanding system by which compressed air is used to force sand from sand traps to the rails in advance of the drive wheels to increase the friction between the rails. In a sanding operation a valve in the cab of the locomotive is operated to admit operating air into the casing of the control valve. The control valve of the patent in suit, '794, is connected by one line or pipe to each sand trap and operates to allow passage of air of different rates of flow to each trap through one line so as to provide at the beginning of the sanding, a blast of short duration and high pressure known as a

"cleanout blast", followed by a second stage in which the air is reduced in rate of flow and pressure to accomplish the actual sanding operation (known as the "sanding" blast). This is followed by a final "clean-out" blast which again cleans the air from the discharge pipe and the part of the trap in front of the nozzle to prevent clogging.

The valve disclosed in '794 comprises a casing, a movable valve member either differential or provided with a large head and a small head, a large opening or clean-out orifice, a smaller restricting orifice, or means to permit limited flow and a piston stem or other means on the valve member to cut communication to the large orifice. When the valve in the engineer's cab is actuated to permit fluid pressure (air) to pass from a source of supply through the actuating line into the piston cavities, this pressure causes the piston to move downwardly displacing the auxiliary valve head. When this smaller valve head is unseated, fluid pressure within the lower cavity (which is admitted by an inlet port and pipe in direct and constant communication with a source of fluid pressure, preferably the main reservoir) will surge through both the large and small orifices into a common passage and then out of the ports and through the lines or pipes to the sand traps to effect a clean-out operation. When the stem of the valve member comes to rest on its seat—the large orifice is cut off by the enlarged shouldered portion of the stem leaving open the small orifice for passage of fluid pressure into the passage and then through the ports to the lines to effect the lower pressure sanding operation. Upon the engineer's cutting off the fluid pressure by means of his actuating valve (throttle) in the cab, the valve member will return to its original closed position— again opening momentarily the large orifice and permitting a final clean-out blast to be transmitted to the sand traps.

The prior art upon which defendant principally relies in asserting lack of inventiveness is the Ranson Patent '546 and its commercial embodiment—the GWS–111 valve which prior to the conception of Frantz '794 had been the standard control valve on locomotives. The Ranson patent had been owned by Graham-White and was one of the patents sold to Prime under the 1942 contract. In addition the Ranson application ·had been prosecuted by the same attorney who prosecuted the application for '794, the patent in suit.

The Ranson valve operates in much the same manner as '794 and contains most of the same mechanical elements. It, too, has a valve member either differential or provided with a large or small head which upon displacement allows fluid pressure (air) to flow from a large orifice to affect a clean-out blast. When the orifice is closed either by a seat (as provided in the commercial GWS–111) or by the side wall of the piston valve as it slides within the casing (as shown in the patent) the air flows through another orifice in the valve to effect a sanding operation. Upon cutting off the valve in the engineer's cab, the large orifice is again opened to permit a final cleaning blast.

However, in Ranson, unlike the patent in suit the two orifices or ports are each connected to a separate pipe which lead from the valve to the sand trap. The valve is designed for use with a sand trap having two entry ports—one to admit the clean-out blast and another to admit the sanding blast through a nozzle extending into the trap itself. Although the orifice or outlet port in the Ranson valve is smaller than the clean-out orifice or outlet, in practice the outlet port does not limit the flow of air to the desired rate of flow necessary to accomplish the sanding operation. Instead the nozzle at the sandtrap contains a restricted jet to reduce the flow sufficiently to accomplish the sanding operation.

It is the task of this court to examine the claims of the patent in suit in order to determine whether the changes claimed amount to patentable invention over Ranson under the statutory test, i. e., "that the subject matter as a whole would

have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains", 35 U.S.C. § 103, in this case the art of fluid operated valves and piping.

Prime contends that all of the claims in suit are invalid for lack of invention over Ranson in the light of the other prior art on which it relies. Alden, No. 2,000,553, issued in 1932; Frantz No. 2,175,151 issued in 1939, and Frantz No. 2,293,129 issued in August, 1942. In the prosecution of the patent in suit, for some unexplained reason, these patents were not cited as reference by the Patent Office, although, except for Alden they all relate to locomotive sanding equipment. Neither Frantz nor his attorney brought them to the attention of the Examiner although Frantz must be held to be charged with the knowledge of his own inventions and the patent which he had acquired. (Ranson)

We are met initially with the question of the effect of the statutory presumption of validity afforded the patentee by 35 U.S.C. § 282. The Seventh Circuit's position in reference to the presumption is clear. It adheres to the rule that as against prior art not considered by the Patent Office, a presumption of validity does not exist. Day-Brite Lighting Inc. v. Sandee Mfg. Co., 286 F.2d 596; Senco Products Inc. v. Fastener Corp., 7 Cir., 269 F.2d 33, 34; Hobbs v. Wisconsin Power & Light Co., 7 Cir., 250 F.2d 100, 105. In the case at bar not only were these patents (except Alden) not before the Examiner but they were well known to both the patentee and the attorney prosecuting the application.

Furthermore, a reading of the file wrapper discloses that after two rejections by the Examiner the patentee's attorney argued to the office that "Applicant cannot find in the references of record taken together or singly a casing having a valve member formed by piston heads of different diameters connected by a shouldered stem." The Ranson valve, however, discloses this structure and the patentee's attorney chose not to

apprise the Examiner of that art. Virgil Frantz, the patentee, admitted on cross-examination that had the Ranson patent been listed as a cited reference by the Office, this would fall within that "broad statement."

This court can conceive of few situations in which the statutory presumption of validity has less effect than the case at bar. Indeed, it is so diluted as to mean little more than that Prime must bear the initial technical burden of going forward with the submission of proof.

Patent '794 originally contained eleven claims; Claim 11 was disclaimed by statutory disclaimer filed October 18, 1960 after the commencement of this suit and Claim 4 is not charged to be infringed.

Claim 7 is the broadest claim of the patent and reads almost directly on Ranson. It does not recite any manifolding (i. e., the provision of a common passage or chamber located in the valve casing to combine the clean-out blast and sanding blast into a single pipe). It does claim a "means adjacent to said stem to permit a limited flow of air through another orifice when said clean-out orifice is closed." But, as Professor Swanson, Prime's expert testified, Ranson also provides a limited flow by means of the size of the orifice itself; although in practice in the Ranson valve, the pipe leading from this smaller orifice or port led to the nozzle in the sand trap which also had a jet for further restriction of the flow. The specifications of the Ranson patent in this connection read:

> " * * * since the area of pipe 21 (clean-out orifice) is *greater* than the area of the pipe 22 (sanding orifice) and since the pressure through pipe 22 (sanding blast orifice) is *further restricted* by the sanding nozzle—the greater volume of fluid pressure will escape through the pipe 21 (clean-out blast orifice)."

This language thus recognizes that there is a restriction at the orifice in the valve although the degree of restriction is unspecified.

Since there is no distinguishable or material difference over Ranson, we find Claim 7 invalid for lack of invention.

Claim 8 is the same as Claim 7 except that it includes the mechanical expedient of providing opposite outlet ports to enable the valve to supply air to two lines for two sand traps. This expedient is shown in the pattern for GWS–1169 (a commercial embodiment of Ranson patent). Therefore, we find Claim 8 invalid for lack of invention.

Claims 1 to 3 and Claim 10 narrowly define the valve structure for operating only one sand trap. In each claim the only material difference over Ranson is the provision for two different size orifices connected to one manifold "outlet passage" (or chamber). Defendant asserts and we so find that this feature is old in the art as disclosed in Alden and in Frantz '151.

The Alden valve as shown in Figure 17 of the Alden patent was designed to deliver an initial large volume of fluid followed by a small volume of fluid through a single outlet. To accomplish this, a slow speed orifice and a high speed orifice are manifolded to a single chamber or passage which leads to a single outlet as in the Frantz patent in suit. The valve was designed to give a fast travel of a machine carriage when both orifices are open and a slow travel when only one is open. A similar manifolding is also shown in Frantz 151. That patent covered an improved sanding nozzle and was designed to be used in a sanding system having two separate lines to the sand trap—one for a clean-out blast and one for a sanding blast. However, in connection with the nozzle for the sanding blast, it discloses a valve designed to provide flowage of two different volumes of air through a single passage. In Frantz '151 the valve, when opened, permits an initial clean-out blast to be sent through a single outlet (the nozzle) into the sand trap. When the valve closes a reduced volume of air is admitted by means of cross ports in the head and piston of the valve through a single outlet (nozzle) into the sand trap.

For these reasons we find that to one skilled in the art having before him the teachings of Ranson, Alden and Frantz '151, the step taken by the patentee in manifolding the two orifices in the body of the valve to a common outlet would be obvious and not inventive.

Claims 5 and 6 which are the same as 1 to 3 except that they define the parallel outlets for operating two sand traps as in Claim 8, are invalid for the reasons already set out.

Claim 9 of the patent is the only one which recites a combination of an operating valve and a single air line leading from said operating valve for effecting a clean-out blast and a sanding blast to a sand trap. The remainder of the claim is substantially the same as Claims 1 to 3 heretofore discussed. Although it does not call for a chamber as do the other claims, the structure defines the manifolding of the two orifices to a single passage (air line) which, as we have seen, is shown by Alden and Frantz '151 and is, therefore, also invalid for lack of invention.

Counsel for Graham-White contend that the modification of Ranson cannot be held to be obvious in the absence of a teaching in the prior art both of a sand trap having a single line for supplying clean-out and sanding air and of a restricted sanding orifice located in a control valve elsewhere than at the sand trap. This argument is without merit. The patentee is limited to the claims allowed. Except for a possible construction of Claim 9, he has claimed only a valve structure. He does not claim a valve in combination with a sand trap having but one air line leading to it. And if Claim 9 could be construed as claiming this combination it is invalid in view of the '499 hereinafter discussed.

Double Patenting.

■ Frantz '499 was an earlier filed copending application with Frantz '794 in the Patent Office. Defendant contends that the claims of '794 are void for double patenting because they do not patentably distinguish over the "one-line" sander

claimed in the '499 patent which issued. The rule as adopted by the Seventh Circuit is that to avoid double patenting it is not enough that there be differences between the claims of the two patents involved but the differences must rise to the level of patentable invention. Weatherhead Company et al v. Drillmaster Supply Co. (C.A.7, 1955) 227 F.2d 98.

Patent '499 is a patent to a combination of a valve and a sand trap. It embodies the concept of a sand trap and a single nozzle in the trap for introducing both sanding and cleaning air. The valve claimed in the patent recites a single outlet so that, in use, one valve and nozzle are mounted at each sand trap.

Claim 6 of Patent '499 claims

"a sanding mechanism comprising a body provided with spaced sand supply and discharge ports, a sole nozzle projecting into said body and being directed toward said discharge port for transmission of cleanout and sanding applications of air to said body, *an air supply valve communicating with said nozzle, a seat in said valve at the entrance to said nozzle, a differential piston arranged to reciprocate within said valve, said piston at one end being normally spaced from said seat for allowing a cleanout blast of air to said nozzle and adapted to engage said seat to bar the entrance of a cleanout blast of air to said nozzle, said piston having an end larger than said seat-engaging portion and adapted to be subjected to air pressure to move said piston toward said seat, and means within said piston whereby a predetermined amount of air is permitted to pass through said nozzle.*"
(Emphasis added)

If we keep in mind that in Patent '499, the single nozzle through which the sanding and clean-out blasts of air flow is comparable to the single line in '794, it is apparent that the difference in the claimed valve structure of '794 over '499 does not rise to patentable invention. The only difference in the valve structure in '499 is that the restricted sanding orifice is located "in the valve member." This difference, as testified to by Prime's expert, Dr. Swanson, amounts to no more than a mechanical equivalent and is not inventive. Indeed, Virgil Frantz, the inventor himself described the difference as "largely design differences of a minor nature."

Graham-White does not contend that this difference is patentably distinguishable over the valve disclosed in '499. However, it is Graham-White's position that the principal novel feature of the combination *claimed,* is not the valve structure but the single nozzle for transmission of both standing and cleanout air. Graham-White relies on the teaching of Application of Horneman, 194 F.2d 108, at pages 111 and 112:

"'It is a settled law that a party might be entitled to a patent for a combination *because of the cooperation of the elements contained therein,* and at the same time be entitled to a separate patent for one of the elements of the combination [citing cases]. * * * If the claims are so related that the separately claimed element constitutes the essential distinguishing feature of the combination as claimed, different concepts are not involved, the inventions are not distinct, and double patenting will be found. * * *'" (In re Coleman et al., 189 F.2d 976, 38 C.C.P.A. 1156)

We agree that this is a correct statement of the applicable law. But Graham-White's contention that the nozzle and not the valve structure claimed in '499 is its principal novel feature, does not square with the facts as disclosed in the file wrapper history of '499. It is the detailed structure of the valve claimed in '499 which permits the use of a single nozzle and is the inventive feature, if any exists, of the patent. It is noted here that the application for '499 was filed on March 9, 1944. There were three rejections by the Office before its allowance on June 20, 1947. In the final communication by patentee's attorney on April 25, 1947, he argues that "Here in this ap-

plication by use of a *single novel valve* (emphasis added) a single nozzle is associated with a body to effect both a sanding and clean out operation."

Since, therefore, as heretofore stated, the location of the restricted sanding orifice in the valve body rather than in the piston was within the skill of and would have been obvious to any mechanic skilled in the art, it does not constitute patentable invention and '794 is therefore invalid for double patenting.

In view of the above findings, we do not find it necessary to consider the issue of whether the patent is void for indefiniteness.

### 3. Infringement.

We see no point in an extended treatment of the issue of infringement. It has been stipulated that the GWS–250 manufactured and sold by Prime infringes '794. It has been further stipulated that a determination of infringement or non-infringement of GWS–250 P shall apply equally to the GWS–250 P1.

GWS–250 P falls clearly within the claim, No. 7, if not all of the claims, and consequently, infringes. A comparison of 250 P and the '794 discloses that the only material difference is that the GWS–250 P is made in two parts— one part comprising the valve proper, consisting of a piston assembly with differential heads and seat to close off the clean-out or blasting air outlet. It has a spring to urge the piston upwardly and an inlet for the control air from the operator's cab. It also has an intake valve assembly which controls the inlet of air under pressure from the reservoir. The interior has a chamber from which leads a small or restricted air outlet opening and a larger or less restricted air outlet opening. The second part consists of a mounting bracket assembly which includes openings for pipe connections for the pipes leading from the control valve and the main reservoir and for pipes leading to the sand trap. It also contains the interior chambers forming the manifold which joins into one outlet for each trap the air from the restricted sanding outlet and the air from the cleanout or blasting outlet. These two parts are sold as a unit under the designation 250 P. This unit in operation performs the same function in the same way and accomplishes the same result as the 250. See Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147; Nordberg Mfg. Co. v. Woolery Machine Co., 7 Cir., 79 F.2d 685, 692. If, therefore, invention is found, Prime does infringe.

### II. Patent No. 2,739,570—Bell Ringer.

The patent in suit is No. 2,739,570 (hereinafter referred to as '570), which issued March 27, 1956, upon an application filed on February 2, 1951 by Virgil Frantz. The commercial designation of this bell ringer is the Br. 106.

Prime admits infringement but asserts as affirmative defenses (1) estoppel of defendant to assert the patent against it by virtue of (a) the understanding between Frantz and Prime as to patent rights in new railroad products developed for their mutual benefit, (b) Prime's significant inventive contribution to the design of the '570, its contributions of engineering and testing services, (c) development of a market for the bell ringer through its sales and promotion efforts, and (d) Frantz's silence during the entire period. (2) Invalidity for lack of inventiveness in view of the prior art patents and the disclosure of the Br. 104 by Prime to Frantz.

Date of Conception of Invention embodied in the Patent.

At the outset it is necessary to decide one of the principal factual disputes between the parties since its resolution is relevant to both the defense of estoppel and invalidity for lack of invention. The question is whether Frantz conceived the invention of the patent in suit prior to Prime's undisputed disclosure to Frantz of its own Br. 104 drawing on December 5, 1949. If that question is resolved in favor of the plaintiff then on the issue of estoppel certain of defendant's claims of inventive contribution must fail and

on the issue of validity, the Br. 104 drawing is not available to defendant as prior art. If resolved in favor of the defendant, then all of its claims of inventive contribution must be considered and the Br. 104 is available to defendant as part of the prior art.

Beginning in 1947 Prime sold a bell ringer designated as the Br. 1, known as the Superior Bell Ringer (hereinafter referred to as the Br. 1). The Br. 1 was manufacture for Prime under the Bridgham Patent No. 1,929,197 which is part of the prior art relied on by the defendant in its defense of invalidity for lack of inventiveness and was cited as a reference by the Patent Office.

On April 6, 1948, Frantz wrote to Kelly of Prime requesting drawings and descriptive matter relating to bell ringers because

"* * * We want to lay one out for the diesels that will eliminate the need for graduated air flow. After all we think we can get up something very simple and inexpensive to make."

According to Frantz, he had had no previous contact with bell ringers for locomotives.

Kelly of Prime complied with the request and on April 20, 1948, sent a copy of the Br. 1 and the circular covering it. He stated in his letter that

"This bell ringer is a fine product but we are not manufacturing merely selling it and we are extremely dissatisfied with the price.[2] We certainly would be very much interested in selling a bell ringer of equivalent quality at the right price."

A number of patents covering bell ringers were cited to Frantz in that letter including the Bridgham patent. Thereafter, pursuant to a letter requesting that a sample bell ringer be sent, Prime shipped a Br. 1 to Frantz. In a letter of May 13, 1948 from Frantz acknowledging receipt of the sample bell ringer, Br. 1, Frantz wrote

"* * * you see we don't know anything about the development of the art and we almost have to know that before we can do anything intelligent in the way of designing a new one. In other words we have to find out what the other fellow has done before we know what we can do without stepping on somebody's toes."

The final letter in this exchange of correspondence was from Kelly to Frantz on May 21, 1948 in which Kelly described some of the other bell ringers on the market and wrote that he would only be interested in a good bell ringer that could be sold to the railroads for $15.00 to $16.50.

From May 21, 1948 to December 5, 1949, a period of one and one-half years, there is no written evidence either in the way of letters between the parties or dated documents relating to bell ringers.

On December 1, 1949, J. E. Vaughn, Secretary of Prime, wrote to Graham-White attaching a complete set of drawings of the Br. 104 "showing the assembly of a bell ringer which we recently designed which we believe is superior to the bell ringer we are currently marketing and superior to any bell ringer being offered the railroads today." The letter asks if Graham-White would be interested in manufacturing it and requests that they quote a price. The letter was received by Graham-White on December 5, 1949.

Thereafter, on December 14, 1949, Graham-White telegraphed Harvey Bredlow of Prime asking "Can you ship us locomotive bell for bellringer experiment." And on December 30, 1949, a dated drawing (Exhibit 38) made by Mr. Switzer, Frantz's draftsman, depicting a bell ringer similar to the one shown in Frantz's Patent '570, was sent by Frantz to Prime. This is the first dated drawing disclosing the conception of the invention of Patent '570, and there is no question but that it was made after the disclosure of Prime's Br. 104 to Frantz. Thereafter, on Janu-

---

2. According to Frantz's recollection it was marketed at a price of over $23.00.

ary 17, 1950, a complete assembly drawing of the bell ringer subsequently designated the Br. 106 and hereinafter referred to as the Br. 106, was sent by Graham-White to Prime.

Graham-White asserts, however, that the evidence supports a finding that Frantz had actually conceived the invention of the patent in suit prior to the disclosure to him of the Prime Br. 104 on December 5, 1949. Plaintiff relies on three undated rough drawings allegedly made by Frantz prior to December 1949, which are in evidence as Exhibits 35, 36 and 37. Plaintiff depends on the testimony of Frantz, his chief draftsman Switzer, the face of the drawings themselves, and a logical time sequence which as plaintiff claims in its brief "makes it impossible to believe that they follow, rather than preceded the Prime drawing of November 22, 1949" and disclosed to plaintiff December 1, 1949.

Mr. Frantz testified that after the exchange of correspondence back in the spring of 1948 heretofore set out, he secured the patents referred to, studied them and thoroughly examined Br. 1, the old Superior Bell Ringer that Prime had sent him.

In order to evaluate the significance of these drawings and Frantz's and Switzer's testimony relating thereto, it is necessary to set out at this point a description of the structure of the Superior Bell Ringer, Br. 1, and its method of operation. The Br. 1 is an automatic bell ringer for railway locomotives which is actuated by a source of compressed air from a control valve in the cab of the locomotive. As its two basic elements it has a two part chambered bell stem that serves as a cylinder for the air motor and has a piston or plunger. Within the stem portion of the plunger is an exhaust passage with an inlet exhaust port just under the piston head and an outlet exhaust port near the bottom end of the plunger. The actuating air is introduced into the bell stem through a port in the side of the bell stem. The head of the piston and its stem have sliding fits with their bores in the bell stem and the plunger is limited in its downward movement by engagement of the piston head with a shoulder or stop. The air supply is brought into the side of the bell stem below this shoulder and received in a space provided by an annular groove around the piston stem. The air passes around the stem of the plunger upwardly into a lower chamber under the piston head, and thence upwardly between the head of the piston and the wall of the cylinder into the pressure chamber above the head of the piston. The clearance between its head and its bore serves to restrict the rate of flow of air and determines the cadence at which the bell is rung. As the air enters the stem for a very slight interval of time the pressure in the chamber below the head of the piston will exceed the pressure in the chamber above the head of the piston and will operate to lift the plunger (or piston). Soon, however, as the air flows to the upper chamber between the head of the piston and its bore, the pressure in the upper chamber, acting on the full area of the piston, will operate to move the plunger down until it engages the arm on the striker and thus move the striker towards the bell. As the plunger moves downwardly the annular groove in the stem of the plunger moves below the air inlet cutting off the actuating air to the chambers. Just after the air inlet is thus closed the plunger will have reached a position where the exhaust outlet in the lower end of the plunger will clear the end of the bell stem cylinder and will be exposed to the atmosphere. The air in the lower chamber is thus suddenly released through the exhaust passage and the high pressure in the upper chamber imparts a quick downward impulse to the plunger causing the striker to hit the bell with a quick blow. After striking the bell the striker immediately begins to return. The pressure in the upper chamber exhausts more slowly because of the limited rate of flow along the piston head and thus the striker will recede slowly to its normal gravitated position. When the plunger has moved upward to a position where the outlet port to the at-

mosphere is closed, the annular groove in the plunger will again be brought into register with the air inlet and pressure again enters the lower chamber which will assist in lifting the plunger and permit a more free return of the striker. When the plunger has been lifted far enough and the striker has reached its normal gravitated position, the piston will again be in a position for the cycle to commence out.

Frantz testified that after receiving the sample Br. 1, in April of 1948, and testing and examining it, he found certain faults in the Br. 1, other than its price.

(1) Since the cadence in the Br. 1 was determined by the fit of the head of the piston with its bore, as "you began to get wear on the piston and in the bores of the bell ringer * * * your cadence or rapidity with which you rang the bell completely changed and you began to hit the bell so fast that you killed the tone of it and killed the carrying quality."

In order to maintain the desired fit, the parts had to be hardened and ground, and after wear occurred the cadence would increase from the desired 60 stroke per minute to 125 or 150 a minute. When this occurred the only thing that could be done was to "start all over again with a new bell ringer because you couldn't do anything about these worn parts."

(2) The Br. 1 was very difficult to service. Since the bell ringing mechanism was placed in the bell stem, in order to get at the working parts it was necessary to disconnect the air line bringing the air to the bell ringer, and then disassemble and remove the bell from the locomotive. This latter step is necessary because the threaded joints between the upper and lower parts of the bell stem are placed immediately below the dome of the bell and the parts are held securely in place by a set screw accessible only from above.

With these two disadvantages in mind, Frantz testified that he began to make rough sketches of ideas to improve the Br. 1 and his first ideas were embodied in the undated rough sketch, Exhibit 35.

He claims that this sketch was made sometime in the latter part of 1948. Exhibit 35 is a free-hand pencilled sketch on yellow legal-sized lined paper. The sketch retains the air pipe on the side of the bell stem but instead of placing the mechanism directly in the stem of the bell, Frantz introduced a "sleeve" into the casing from the lower end of the bell stem sealed off with O rings, and the use of "O" rings sealing members on the bell ringer piston. The sketch has an enclosure cap on the bottom of the stem to hold the sleeve and operating mechanism to which the bell clapper is attached so that by the use of the clapper as a wrench it would be easy to remove the cap and the sleeve and the working parts of the bell ringer.

According to Frantz his next step was another rough pencilled sketch, Exhibit 36, also undated and on the same kind of paper as Exhibit 35, which he made within a month or so after Exhibit 35, or the early part of 1949. In this sketch, the pipe coming into the side of the casing is eliminated, and the operating air is introduced through the stem of the bell itself. The "sleeve" or bushing was then closed at its top so that the entire air motor mechanism is a removable cartridge enclosed in a housing provided by the bell stem. In this sketch the path of the air flow through the bell ringer is also changed carrying the intake air for the first time through a passage in the center of the stem and through a port under the head of the piston. In this conception, Frantz put sealing means (O rings) to prevent any air passing out of the guide bore except through an intake port in the bottom part of the stem. These seals resulted, according to Frantz, in eliminating the irregularity of cadence caused by wear of metal to metal sealing surfaces. Exhibit 36 contains certain measurement specifications of the various parts of the mechanism.

The next undated sketch, Exhibit 37, according to Frantz, was made by his mechanical draftsman, Mr. Switzer, at his direction, and is a more refined sketch so that the parts necessary to make a test

bell ringer, could be made. This Frantz contends was done "sometime after" Exhibit 36. This sketch is on a large piece of white drafting paper showing grease stains on its edges. In addition to the drawing by Switzer on that exhibit, there are free-hand crude sketches by Frantz which he claims were made some months later in the latter part of 1949 after a test bell ringer had been made up and tested on a test rack. These rough sketches were allegedly made to show modifications to meet the problems which arose in testing. One of them, which was never used, showed a "filtering means in the stem of the bell ringer" in order to filter out foreign matter before it got into the stem. The other rough sketch shows the locking of the lower cap and clapper supporting means by an external set screw rather than a screw extending through the stem. Frantz testified that in addition to these drawings there were many other sketches that Mr. Switzer made which he kept in what he called a development file, but which were destroyed in a fire in the office section of his plant in 1952. These sketches were not destroyed because "I happened to have some of these sketches in a file that was in my desk." According to Frantz, a model embodying the structure shown in Exhibit 37 was made and put on trial in the early spring of 1949. The test ran intermittently for some months in 1949. Frantz testified that the structure as shown in Exhibit 37 except for some minor changes is the same as the drawings in the patent '570.

Mr. Switzer, Frantz's chief draftsman, by his testimony also attempted to establish the dates of these exhibits as prior to December of 1949. He testified that he prepared the dated drawing of December 30, 1949, Exhibit 35, from various free-hand and rough shop sketches including Exhibits 36 and 37. Switzer testified that a model made from Exhibit 37 had been tested off and on all of the year 1949 and back into 1948. Judging from the amount of work which had been done on the bell ringer during the year 1949,

Switzer estimated that he had first seen Exhibit 35 about a year before he prepared Exhibit 37. He also testified that in the profession of designing and drafting, a drawing such as Exhibit 39 (the assembly drawing by Switzer dated January 16, 1950) would be near the end of a chronological procession of drawings.

It is uncontroverted that Prime's Br. 104 drawing was disclosed to Frantz on December 5, 1949, which is prior to the first dated drawing of Switzer, Exhibit 38. Therefore, Prime has made a prima facie showing that the Br. 104 conception was known to Frantz before his conception of the patent in suit. Graham-White has not challenged the authenticity of the Br. 104 drawing [2] but seeks to avoid Prime's Br. 104 as prior art by establishing a conception date by Frantz of the invention of the patent in suit, '570, prior to the disclosure by Prime in December of 1949.

There is some dispute between the parties in regard to their respective burdens of proof in relation to this issue. It is true that defendant has the burden of proving invalidity of the patent for lack of invention by clear and unequivocal evidence. American Lecithin Co. v. Warfield Co. (C.A.7) 128 F.2d 522; Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143. It is also true, as plaintiff contends that the burden is upon defendant to prove that a patent, issued on its face to a sole inventor, actually was improvidently granted as directed to a joint invention. However, when as here, the inventor seeks to carry his conception date back to a time before an allegedly anticipating fact, he then assumes the burden of proof and the evidence he produces must be clear and unequivocal. American Lecithin Co. v. Warfield Co., supra; T. H. Symington Co. v. Nat'l Malleable Castings Co., 250 U.S. 383, 39 S.Ct. 542, 63 L.Ed. 1045; Walker on Patents, Vol. 1, p. 306; Hann v. Venetian Blind Co., 9 Cir., 111 F.2d 455.

In Pleatmaster, Inc. v. J. L. Golding Mfg. Co. (C.A.7) 240 F.2d 894, the court

2. The record shows that the Br. 104 was put on test by Prime in November of 1949.

cited with approval the language of the Second Circuit in United Shoe Machinery Corp. v. Brooklyn Wood Heel Corporation, 2 Cir., 77 F.2d 263:

> " 'When an inventor's date is to be carried back beyond his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case, in practice perhaps even more so. [citing cases] It makes no difference how the question arises; whether the patentee is carrying back his own invention, or a supposed infringer is carrying back his; the burden is the same as the proof necessary to establish a prior use.' "

We have set out in considerable detail the oral testimony of Frantz and his associate, Switzer, by which they seek to sustain this burden and it is the court's opinion that it falls short of a convincing showing of a conception prior to the dated assembly drawing of December 30, 1949.

From January of 1950 through May of 1950, there is considerable correspondence between the parties in evidence, relating to the extensive tests made by both Prime and Graham-White to remove the "bugs" from the Frantz bell ringer design so that it could be presented to the railroad industry. Yet there is not a single item of correspondence between the parties during the entire year of 1949 when Frantz claims a model bell ringer had been made and was being tested in the Graham-White plant in Virginia. Frantz's explanation is not that the work was intentionally concealed from Prime, but rather that he made frequent telephone calls to Mr. Kelly about the bell ringer tests and that Mr. Kelly had seen the model on test during that time. Yet plaintiff did not call Mr. Kelly as a corroborating witness even though he was at the time of trial a director and stockholder of plaintiff, nor did plaintiff produce any disinterested witness who had worked on the bell ringer.

The model bell ringer itself was not produced nor was there introduced by plaintiff a single dated document, diary, shop order, test report, etc. relating to the work allegedly done during this period of time. An examination of the undated drawings themselves unaided by the self-serving testimony of Frantz does not establish that they must have been made prior to December of 1949 as plaintiff contends. When compared with the Br. 104 disclosure they reveal a progressive sequence of modifications of the Br. 104. Thus in Exhibit 35 the clapper mounting removable cap is shown as a distinction over the closure plate of the Br. 104; in Exhibit 36 the closing of the cartridge at the top and the carrying of the intake air through the bell stem can be seen as a change over the Br. 104. Thus we see no "inherent probabilities" that these drawings were conceived and reduced to written form by Frantz before the Br. 104 disclosure. It appears to the court that it is just as likely that these drawings were made subsequent to the Br. 104 and in the month of December, 1949, as that Frantz had conceived the invention, reduced it to practice and tested it for almost a year prior thereto without either making written reports to Prime, preserving the model, or producing some dated drawing of the invention. The patent was not applied for until February 2, 1951, and the most the proof sustains is a carrying back of the conception date to December 30, 1949. Therefore defendant's Br. 104 is available to defendant as prior art in determining the validity of the patent under 35 U.S.C. § 103.

1. Estoppel.

The applicable legal principles of equitable estoppel have already been set forth in the discussion of the control valve patent '794. There remains only to determine whether the facts and circumstances surrounding the development of the invention embodied in the bell ringer patent also estops Frantz from asserting its patent '570 against Prime.

The record discloses the same pattern of cooperation, free interchange of ideas

and joint effort in developing the Br. 106 as was present in the case of the control valve.

After the submission of the bell ringer to Prime, as redesigned by Frantz in December of 1949, a sample bell ringer was sent to Prime for independent testing. On March 3, 1950, a letter from Kelly to Frantz reports on the results of the tests and the problem of the failure of one of the new bell ringers because the "strainer was plugged up with this oil and grit being fed into the line." On March 14, 1950, Frantz wrote to Harvey Bredlow reporting on tests made in Roanoke on the bell ringer under freezing conditions. On May 15, 1950, Kelly wrote to Bredlow of Prime suggesting that Frantz make certain changes in the bell ringer structure, and on May 18, 1950, Frantz wrote to Kelly acknowledging the report and discussed the manufacturing details of the bell ringer.

After the bell ringer was working properly, the first order for six bell ringers was placed by Prime with Graham-White and was designated the Br. 106. Thereafter, Frantz applied for his patent on February 2, 1951, and Prime devoted its efforts to developing a market for the sale of the new bell ringer. All of the sales and advertising expense was borne by Prime, and the sales literature has the marking "PRIME BELL RINGER—Patents applied for". Following issuance of the patent to Frantz, the relationship of the parties continued unchanged, Graham-White manufacturing the bell ringers exclusively for Prime, Prime ordering them on an agreed price from Graham-White and marketing them.

The record also supports the finding that Prime, through its engineering department, played a significant role in contributing certain features of the invention itself. As seen heretofore, Prime's Br. 104 represented an improvement over the old Superior Bell Ringer (Br. 1) by the introduction of a sleeve or bushing into the stem of the bell ringer and the use of a removable plug type metering control vent in the head of the piston. This latter feature was incorporated by Frantz in his design and depicted in the patent drawings, and is specifically claimed in Claim No. 4 of the patent. All of the 106 bell ringers manufactured and sold employed this feature.

In the light of these facts, Graham-White cannot in equity take advantage of the relationship to the injury of Prime. The equitable principle underlying the "shop rule" applies with equal if not greater force where as here the invention was made possible by the confidential relationship and contributions of Prime to the development of the bell ringer. We hold that plaintiff is estopped from suing for infringement of patent '570.

2. Validity.

Prime asserts that the differences between the invention defined and claimed in the six claims of the patent in suit are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

Prior art cited by defendant includes the Br. 1 bell ringer of Bridgham patent No. 1,929,197 which was cited by the Patent Office, Martin No. 1,497,925, Gilman No. 1,008,812, and the Prime Br. 104 disclosure which were not before the Patent Office.

Both Bridgham and the Br. 104 contain most of the basic structural elements of the '570 bell ringer patent, and both operate on the same principle and accomplish the same result. Thus all three bell ringers use a reciprocal piston which swings a pivoted clapper against the bell and all use the weight or bounce of the clapper to return the piston and its stem back to a point where the exhaust port in the piston stem is closed and all make use of an expansion or pressure chamber which cooperates with a restrictive passage to control the cadence.

Claims Nos. 1 to 5 may be considered together. They define the elements of the air motor as (1) a main housing or chamber (the bell stem) connected to a

source of fluid pressure. In Claim No. 1 the air inlet is at the top; (2) a closed cartridge removably contained in the bell stem and defining the air motor; (3) a closure or cap to hold the cartridge in place; (4) the cartridge defines a cylinder and guide bore in which there is a piston head and a piston stem which projects from the cartridge to engage and operate the clapper of the bell; (5) the piston stem has two ports connected by an internal passage—these ports being spaced and separated by a sealing member (O ring) positioned between the stem and guide bore so that as the piston moves up and down the lower port acts first as an inlet and then as an exhaust; (6) a metering control vent or orifice in the piston head. In Claim No. 4, said control vent is contained in a removable plug. Both Bridgham and Prime Br. 104 show the bell stem connected to a source of fluid pressure, a piston head having a stem which projects from the bottom of the bell stem to engage and operate the clapper; ports in the piston stem connected by an internal passage.

Prime's Br. 104 defines a cylinder provided by a bushing or sleeve in the bell stem which, according to Dr. Swanson, Prime's expert, can be removed through the opening in the lower portion of the bell stem and is the equivalent of patent's '570 removable cartridge. The Br. 104 also shows a cap for the chamber to hold the removable bushing or cartridge in place, a metering and cadence control vent in the piston head through which the air flows to reach pressure chamber. The only elements not shown in either Bridgham or the Br. 104 is (1) the air inlet at the top of the bell stem; (2) the closing of the cartridge at its upper end, and, (3) the provisions for a sealing means between the piston stem and its guide bore. Provision for the operating air entering through the bell stem is old—it having been described in the Martin bell ringer patent. The use of sealing means to prevent the fluid pressure from reaching the underside of the piston head except through a central passage is also old. The Br. 104 employs sealing means in the

head of the piston for the purpose of directing the passage of the fluid air to the pressure chamber through the cadence control vent rather than between the side of the piston head and its guide bore.

Neither is the concept of leading operating air between a main housing and the wall of an inner cylinder (the equivalent of a cartridge or bushing) new. This path for air flow was shown in the patent drawings of the Gilman patent which relates to a pneumatic motor for swinging cutters in a tool for cleaning boiler tubes.

Having chosen to introduce the operating air through the top of the bell stem, the closing of the open-ended bushing of the Br. 104 is not only rendered obvious to one skilled in the art but is a necessary result of the choice.

 The standard of invention to be applied to combination claims has been set forth by the United States Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, at p. 152, 71 S.Ct. 127, at p. 130, 95 L.Ed. 162:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

 All of the features in Claims Nos. 1 to 5 are found in the prior art. The rearrangement or reconstruction effected by Frantz does not change their respective functions or accomplish a new result. Admittedly, the bell ringer in suit includes design changes that distin-

guish Claims Nos. 1 to 5 from the Br. 104 and the Bridgham bell ringer. The design facilitates the cleaning of the pressure chamber of the air motor. The evidence also shows that the bell ringer enjoyed commercial success. But an improvement and commercial success without invention does not make patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra.

■ It is our opinion that the invention claimed in Claims Nos. 1 to 5 would have been obvious, in view of the state of the art at the time the invention was made, to a person having ordinary skill in the art. Hence the claims fail to meet the standard prescribed by 35 U.S.C. § 103 and the Great Atlantic & Pacific Tea Co. case, supra. We therefore find Claims Nos. 1 to 5 invalid for lack of invention.

Claim No. 6.

Claim No. 6 defines (1) a removable cap threaded on the open end of the bell stem at its lower end, (2) a replaceable cartridge within the bell stem and insertable and removable through the opening and held in place by the cap, (3) said cartridge having an actuated part (piston with stem) projecting through an end of the cartridge and through the cap, (4) a clapper supporting means on the cap, (5) a clapper pivotally mounted thereon in a position to be engaged by said actuated part (piston) so that the clapper may be used (as a wrench) to thread and unthread the cap.

The distinguishing feature of this combination not shown or suggested in either Bridgham or the Br. 104 or any other prior art is the threaded removable cap with the clapper supporting means mounted thereon in such a way that the clapper can be used as a wrench to unscrew the cap and remove the cartridge within the bell stem while the bell remains in place.

In both the Br. 104 and the Br. 1 the clapper supporting means is mounted on the bell stem itself. The function of the clapper is only to strike the bell. It serves no other purpose. The Br. 1 is so constructed that in order to remove the motor means it is necessary to entirely disassemble the bell. There is nothing to suggest a removable cap or the use of the clapper as a tool in the disassembly of the bell ringer parts. In the Br. 104 the bushing is held in place by a removable plate or cap attached by screws to the lower end of the bell stem. The clapper, however, must be removed in order to detach the plate. Although the Br. 104 could easily be modified to support the clevis for the clapper on said plate there is no suggestion of both threading the cap to the bell stem and of using the clapper as a wrench.

■ It is our opinion that the proposed modification does not obtrude itself from the prior art and becomes obvious only after the idea of using the clapper as a tool in disassembling the bell ringer is conceived. It is this conception of such use which constitutes the inventive idea of this combination. The seeming obviousness of the proposed modifications is apparent only after the idea has occurred to the inventor and elements from the prior art combined and arranged to implement it. The supposed obviousness is thus the result of hindsight. Apparent simplicity of an invention when viewed in retrospect is not a test of invention. Amp Incorporated v. Vaco Products Co. (C.A.7, 1960) 280 F. 2d 518. Therefore while the combination disclosed by Claim No. 6 is made up of old elements, a new function is performed by the clapper and a new and useful result obtained by the combination. Accordingly, we hold that Claim No. 6 meets the standard of invention prescribed by § 103 and the Great Atlantic & Pacific Tea Co. case, supra, and is valid.

This opinion shall stand for Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Judgment will be entered in accordance with this opinion denying an injunction and dismissing plaintiff's complaint.